863 A.2d 373 (2004)
374 N.J. Super. 13
DIAL BLOCK COMPANY, INC., Plaintiff-Appellant,
v.
MASTRO MASONRY CONTRACTORS, Defendant, and
Ernest Bock & Sons, Inc.; XL Specialty Insurance Company, Defendants-Respondents, and
Ernest Bock & Sons, Inc., a Pennsylvania Corporation, Defendant/Third-Party Plaintiff,
v.
Alfred LaPuma, Frank Falco and Joseph Russo, Third-Party Defendants.
Superior Court of New Jersey, Appellate Division.
Argued December 15, 2004.
Decided December 30, 2004.
*374 Christopher S. Lipari, argued the cause for appellant (Fitzgerald, McGroarty & Lipari, attorneys; Christopher S. Lipari, on the brief).
John F. Palladino, Atlantic City, argued the cause for respondent (Hankin Sandman Bradley & Palladino, attorneys; John F. Palladino, on the brief).
Before Judges BRAITHWAITE, LISA and WINKELSTEIN.
The opinion of the court was delivered by
WINKELSTEIN, J.A.D.
This case arises out of a contract to build the Atlantic County Special Services School and requires an interpretation of the New Jersey Public Works Bond Act, N.J.S.A. 2A:44-143 to -148 (the Bond Act), which protects laborers, subcontractors and material suppliers who work on public construction projects. Plaintiff is a material supplier that is owed money from Mastro Masonry Contractors, the project masonry subcontractor, for materials plaintiff supplied to Mastro for the project. Consequently, plaintiff sued Mastro, Ernest Bock and Sons, the general contractor, and XL Specialty Insurance Company, the company that issued the payment and performance bond for the project. Mastro is out of business and was never served with the complaint.
The primary issue on appeal concerns plaintiff's right to seek payment under the bond. To be so entitled, the Bond Act requires a person to either have a "direct contract" with the general contractor furnishing the bond, or otherwise provide the general contractor with written notice of the person's intent to become a beneficiary under the bond. Plaintiff acknowledges it did not provide Bock with written notice of its intent to become a beneficiary under the bond; but, plaintiff asserts that a joint checking agreement (the Agreement) it entered into with Bock and Mastro serves as the "direct contract" required by the Bond Act to qualify plaintiff as a beneficiary and assert a claim for payment under the bond.
On cross-motions for summary judgment, Judge William Todd found that the Agreement did not constitute a "direct contract" under the Bond Act. The judge also concluded that plaintiff failed to prove its claim for breach of contract against Bock. We agree and affirm.
The facts are not in dispute. In January 2001, Bock and the Atlantic County Special Services School District entered into a contract for the construction of the school. XL Specialty issued the payment and performance bond. In February 2001, Bock and Mastro executed a purchase order; Mastro was to provide labor, material, *375 and equipment "to complete all unit masonry and unit pavers." Mastro, in turn, requested a quote from plaintiff for materials and supplies for the job. As a condition to supplying the materials, plaintiff requested that the parties enter into a joint checking agreement, a "procedure frequently ... done ... with general contractors... subcontractors, and suppliers." In fact, plaintiff had such an agreement when working with Mastro on at least two previous jobs. A Bock representative prepared the Agreement. It said, in pertinent part:
In consideration that Dial Block Co., Inc (Supplier), will supply material to Mastro Masonry (Subcontractor), for installation at the Atlantic County Special Services School in accordance with the Subcontractor's Contract Agreement, Ernest Bock & Sons, Inc., (General Contractor), hereby agrees that the said materials will be paid for by check(s) made payable jointly to the Supplier and Subcontractor.
Total material cost is not to exceed $125,000.00.

Plaintiff's controller, Barry Pflum, understood that the Agreement did not obligate plaintiff to provide Mastro with materials, and neither Mastro nor Bock were required to order "each and every item from [plaintiff]." According to Pflum, the purpose of the $125,000 limit was to protect Bock's "interest and [Bock's] interest alone."
Approximately fourteen months later, Pflum wrote to Bock's vice president, Anthony DePascale, and informed him that the cost of materials supplied by plaintiff had "far exceeded" the $125,000 limit. By that time, plaintiff had already supplied Mastro with more than $300,000 in supplies. Pflum requested that the Agreement be amended to raise the cap to $500,000. DePascale rejected Pflum's request "due to cost overruns by Mastro Masonry on this project." DePascale acknowledged that Bock had "exceeded the initial joint check amount," but explained that Bock had done so because the company "felt it was in all of our best interest[s] to continue joint payments to minimize both our exposure." According to DePascale, Mastro had "committed to [Bock] that they will continue to make payments to their vendors given this circumstance." Finally, DePascale said: "It would be in your best interest to contact Mastro and make the necessary arrangements." Plaintiff continued to supply materials to Mastro.
In response to the letter, Pflum stated that if plaintiff did not receive the sum due under its regular payment schedule, $44,728.86, it would stop supplying materials to Mastro. Pflum also asked DePascale for the name, address, and telephone number of Bock's bonding company. When plaintiff did not receive the payment, it stopped "servicing" Mastro. On August 8, 2002, plaintiff asserted a claim under the bond for $65,840.73.
In total, Bock issued $347,602.53 in joint checks to plaintiff and Mastro. At some point, well after the $125,000 cap was reached, Bock stopped issuing joint checks and paid Mastro directly so Mastro could meet its payroll. Bock paid Mastro in full.
Against this factual background, we turn to whether the Agreement constituted a "direct contract" within the plain meaning of N.J.S.A. 2A:44-145. If it did, plaintiff could seek payment under the bond without otherwise notifying Bock that plaintiff was a beneficiary of the bond. That statute says, in part,
Any person who may be a beneficiary of the payment bond, as defined in this article, and who does not have a direct contract with the contractor furnishing *376 the bond shall, prior to commencing any work, provide written notice to the contractor by certified mail or otherwise, provided that he shall have proof of delivery of same, that said person is a beneficiary of the bond.
[N.J.S.A. 2A:44-145 (emphasis added).]
The motion judge determined that the Agreement was not a "direct contract." In a thorough and well-reasoned decision, he explained:
First question. What's a direct contract? That term, direct contract, is right there in the statute. It has to mean something. It's subject to interpretation. It's obviously not any contract, because if it was any contract it wouldn't need the word "direct." My sense is that ... a [joint checking agreement] like that at issue here is simply not enough. In simple terms, it seems to me that what's at issue is the question of some essential operative arrangement involving the fundamental work to be done between the two parties in question like an agreement to actually construct the property or an agreement to supply materials for the property, and it seems to me appropriate to treat the [Agreement] as something that is relatively incidental to that particularly in the context of a statute that's dealing with, on the face of things, this particular type of contracting problem.
* * *
I think the same is true with respect to the notice issue. Again, the statute is very specific [in its] terms. To paraphrase it slightly, the obligation, if you don't have a direct contract, is to provide written notice that the person is a beneficiary of the bond. Obviously, that's easy to do if you want to do it. Write a letter that says I'm a beneficiary of a bond, and it just seems quite clear to me that the statute contemplates that something fairly specific directed to this issue would be presented, that the fact that an entity is involved in the most general sense in a construction project by itself isn't sufficient to satisfy the intent of this statute.
The result is that I don't believe there is any ... legitimate or reasonable way to treat the plaintiff as having a direct contract with Bock or to conclude on this record that the plaintiff provided the type of written notice required by the statute which means that the bond claim would fail as a matter of law.
The court also dismissed plaintiff's non-Bond Act contract claims against Bock. The judge said: "the law with respect to those claims requires an inquiry into the plaintiff's reasonable expectation of compensation, and on this record I don't think that there is any reasonable way one could interpret the plaintiff as having a reasonable expectation of payment directly from ... Bock." In short, the court found no basis for plaintiff to believe that Bock would pay it in the event that Mastro defaulted; Bock's joint check obligation was otherwise limited to the $125,000 cap in the Agreement, and Bock satisfied that obligation.
The trial court must grant summary judgment when the evidence "is so one-sided that one party must prevail as a matter of law." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146, 156 (1995)(internal quotation omitted). On appeal, we apply the same standard as the trial court to determine whether the grant or denial of a summary judgment motion was correct. Kopin v. Orange Prods., Inc., 297 N.J.Super. 353, 366, 688 A.2d 130, 136 (App.Div.), certif. denied, 149 N.J. 409, 694 A.2d 194 (1997). On matters of law, the trial court's interpretation of the law and the consequences that flow from established facts are not *377 entitled to any special deference, Manalapan Realty, L.P. v. Township Comm. of Township of Manalapan, 140 N.J. 366, 378, 658 A.2d 1230, 1237 (1995), and a decision that is based upon a misinterpretation of the law must be reversed. Kimmelman v. Henkels & McCoy, Inc., 108 N.J. 123, 136, 527 A.2d 1368, 1375 (1987).
When we interpret N.J.S.A. 2A:44-145 to determine if the Agreement is a "direct contract" within its meaning, our "overriding goal" is to determine the Legislature's intent underlying its enactment. Brodsky v. Grinnell Haulers, Inc., 181 N.J. 102, 109, 853 A.2d 940, 944 (2004); State, Dep't of Law & Pub. Safety v. Gonzalez, 142 N.J. 618, 627, 667 A.2d 684, 689 (1995). To do so, we first examine the statute's plain language, which is the "clearest indication of that intent." Med. Soc'y of N.J. v. N.J. Dep't of Law & Pub. Safety, 120 N.J. 18, 26, 575 A.2d 1348, 1353 (1990). "If the statute is clear and unambiguous on its face and admits of only one interpretation, we need delve no deeper than the act's literal terms to divine the Legislature's intent." State v. Butler, 89 N.J. 220, 226, 445 A.2d 399, 402 (1982).
When a statute is silent on an issue, "[a] well-established tenet of statutory construction is that a statute should be construed sensibly and in furtherance of the underlying legislative purpose." Thomas Group, Inc. v. Wharton Sr. Citizen Hous., Inc., 163 N.J. 507, 517, 750 A.2d 743, 748-49 (2000) (Construction Lien Law, N.J.S.A. 2A:44A-1 to -38, silent on interaction between statute and contractual retainage clauses); accord Franklin Tower One, L.L.C. v. N.M., 157 N.J. 602, 613, 725 A.2d 1104, 1110 (1999) (when construing statute, judicial role is to give effect to legislative intent). When both parties have competing interests in how the statute is interpreted, the reviewing court's "task is to fashion protections for both interests, if it can reasonably be done, within the four corners of the statutory scheme." Thomas Group, supra, 163 N.J. at 518-19, 750 A.2d at 749.
Here, the term "direct contract" is not defined in the statute, and the parties' interests are not merely competing, but are mutually exclusive. Either the Agreement is a direct contract, or it is not. We conclude, as did the motion judge, that a sensible construction of the statute establishes that it is not.
The purpose of the Bond Act is to protect material suppliers (among others) that work on public projects from a general contractor's insolvency. Velez v. Wilkerson Elec. Servs., Inc., 351 N.J.Super. 2, 8, 796 A.2d 919, 923 (App.Div.2002). The Bond Act was amended in 1996 to add the language that is the subject of the instant dispute. See L. 1996, c. 81. N.J.S.A. 2A:44-145 now provides that a "person who ... does not have a direct contract with the contractor furnishing the bond shall, prior to commencing any work, provide written notice to the contractor ... that said person is a beneficiary of the bond." (emphasis added). One of the goals of the amendment "was to clearly define the risk assumed by the surety issuing the bond." Velez, supra, 351 N.J.Super. at 10, 796 A.2d at 925 (citing the Sponsor Statement to A-1034, adopted June 17, 1996). The amendment identified potential beneficiaries under the bond by requiring a written notice prior to commencement of the work. Id. at 11, 796 A.2d at 925. As Judge Hoens, then sitting in the Law Division, explained in Laborers Local Union # 779 Pension, Welfare, and Annuityfunds v. Am. Cas. Co. of Reading, Pa., 339 N.J.Super. 345, 351-52, 771 A.2d 712, 716 (Law Div.2000), "[o]ne of the significant goals of the [1996 amendments] was the reduction of uncertainties concerning claims and claimants which plagued the *378 construction industry and, by extension, the surety industry." The amended provision "served ... to identify potential claimants and beneficiaries in a uniform and organized fashion." Id. at 352, 771 A.2d at 716; accord Velez, supra, 351 N.J.Super. at 10, 796 A.2d at 925 (observing that "one of the goals of the 1996 amendments to the Bond Act was to clearly define the risk assumed by the surety issuing the bond").
In the context of this legal framework, we examine the meaning of the term "direct contract." Neither Velez nor Laborers # 779 addressed this issue. Indeed, no New Jersey case has discussed whether a joint check agreement constitutes a "direct contract" for purposes of N.J.S.A. 2A:44-145. But, we need not write on a clean slate. A federal statute, the Miller Act, 40 U.S.C.A. §§ 3131-3134, is considered "the federal analogue of our Bond Act." Unadilla Silo Co., Inc. v. Hess Bros., Inc., 123 N.J. 268, 282, 586 A.2d 226, 233 (1991); see also Morris County Indus. Park v. Thomas Nicol Co., 35 N.J. 522, 531, 173 A.2d 414, 419 (1961) (referring to Miller Act as "comparable federal statute"); W. Bank Oil, Inc. v. Hartford Acc. & Indem. Co., 205 N.J.Super. 56, 63, 500 A.2d 32, 36 (App.Div.1985) (characterizing Miller Act as "Federal equivalent of New Jersey's Bond Act"). Accordingly, we look to federal cases interpreting the Miller Act for guidance.
The Miller Act provides a method for suppliers and contractors to protect themselves from uncertainty as to payment. See U.S. ex rel. Light & Power Utils. Corp. v. Liles Constr. Co., Inc., 440 F.2d 474, 478 (5th Cir.1971). The "statute specifically requires formal notice, in writing." Ibid. Though worded somewhat differently from the Bond Act, the Miller Act speaks of a "direct contractual relationship," just as the Bond Act requires a "direct contract," between the general contractor and the person seeking to become a beneficiary under the bond. Specifically, 40 U.S.C.A. § 3133(b)(2) provides, in pertinent part:
A person having a direct contractual relationship with a subcontractor but no contractual relationship, express or implied, with a contractor furnishing the payment bond may bring a civil action on the payment bond on giving written notice to the contractor within 90 days from the date on which the person did or performed the last of the labor or furnished or supplied the last of the material for which the claim is made. (emphasis added).
Under this statute, federal courts have construed a joint checking arrangement, such as the one at issue here, as not constituting a "direct contractual relationship." See e.g., U.S. ex rel. St. Elec. Supply Co., Inc. v. Hesselden Constr. Co., 404 F.2d 774, 777 (10th Cir.1968). The facts in Hesselden are analogous to those in this case.
The United States contracted with Hesselden for the construction of a school. Id. at 775. Travelers Indemnity Company issued the payment bond. Ibid. Hesselden subcontracted the electrical work to Fulkerson Electric Company, and Fulkerson contracted with the plaintiff, State Electric Supply, to provide materials for the project. Ibid. When State stopped delivering materials to the site because Fulkerson was not paying its bills, Hesselden and State entered into a joint check agreement; Hesselden agreed to issue joint checks to Fulkerson and State. Ibid. Shortly thereafter, Fulkerson filed for bankruptcy while owing State money. Ibid.
The District Court found that the general contractor's agreement to make all future payments by joint checks to Fulkerson and State, and State's agreement to *379 continue supplying materials to Fulkerson, did not create the type of direct contractual agreement contemplated by the statute. Id. at 777. The Tenth Circuit agreed. It reasoned that because Hesselden did not agree to be responsible for payment for the materials the plaintiff supplied, the agreement was not tantamount to the direct contractual relationship required by the Miller Act. Ibid. The agreement merely obligated Hesselden to "make further payments by joint checks." Ibid. Other federal court opinions are in accord. See, e.g., Maccaferri Gabions, Inc. v. Dynateria, Inc., 91 F.3d 1431, 1438 n. 6 (11th Cir.1996) (joint check arrangement did not create direct contractual relationship between general contractor and materialman under Miller Act), cert. denied, 520 U.S. 1167, 117 S.Ct. 1430, 137 L.Ed.2d 539 (1997); Light & Power, supra, 440 F.2d at 478 (same); U.S. ex rel. Metal Mfg., Inc. v. Fed. Ins. Co., 656 F.Supp. 1194, 1198 (D.Ariz.1987) (same); U.S. ex rel. Fordham v. P.W. Parker, Inc., 504 F.Supp. 1066, 1069-71 (D.Md.1980) (same).
The same reasoning, when applied here, leads to the same conclusion. Plaintiff wanted to ensure it would be paid by Mastro, so, as it had done in the past, it requested the general contractor to issue joint checks to itself and Mastro. It was for that purpose that Bock agreed to issue joint checks; at no time did Bock agree to become obligated to pay plaintiff for the materials plaintiff supplied to Mastro. The joint checks represented the money due from Bock to Mastro, not from Bock to plaintiff. Said another way, the direct contract  to provide materials for the construction project  was between plaintiff and Mastro, not between plaintiff and Bock. For this reason, no "direct contract" was created between plaintiff and Bock within the meaning of N.J.S.A. 2A:44-145.
This construction of the term "direct contract" is consistent with the plain language of the Bond Act. We agree with the Law Division that a "direct contract" must mean more than just any contract. Otherwise, the term "direct" would have no meaning. Statutes should not be read to render a term completely meaningless. State v. Malik, 365 N.J.Super. 267, 278, 839 A.2d 67, 74 (App.Div.2003), certif. denied, 180 N.J. 354, 851 A.2d 648 (2004).
In the absence of such a "direct contract," plaintiff was required to give written notice of its status as a beneficiary of the performance bond before it commenced work. See N.J.S.A. 2A:44-145. The notice must provide "that said person is a beneficiary of the bond." Ibid. Plaintiff concedes it failed to provide such a written notice.
Plaintiff argues, however, that even though it did not comply with the literal language of the notice provision of the statute, by entering into the Agreement with plaintiff, Bock was placed on notice that plaintiff was supplying materials to the job site, thus satisfying a purpose of the Bond Act  to notify the general contractor, and consequently the surety, that a person may be submitting a claim under the bond. Although that argument has some surface appeal, it is not convincing for several reasons.
First, the Bond Act specifically calls for written notice to the general contractor that the person is a beneficiary of the bond. The Legislature could have provided for another form of notice, but it chose not to. The statutory language is clear on its face. Second, under the Miller Act, the federal analogue to the Bond Act, the cases have rejected any notice other than a written notice. See Maccaferri Gabions, supra, 91 F.3d at 1437-38; Light & Power, supra, 440 F.2d at 478; Hesselden, supra, 404 F.2d at 777. Third, and most significantly, *380 only with a written notice will the uncertainties of who may file a claim under the bond be removed; potential claimants are identified in an organized and uniform fashion, fostering the goal of the 1996 amendments to the Bond Act. See # 779 Pension, supra, 339 N.J.Super. at 351-52, 771 A.2d at 716-17.
The requirements to provide notice under the Bond Act are not harsh. All a person seeking to become a beneficiary under the payment bond need do is give written notice of that intent to the contractor before starting work. Plaintiff failed to do so. Consequently, plaintiff has no claim to the performance bond under the Bond Act.
Finally, we address plaintiff's contract claims. Plaintiff argues that the Agreement was modified by the parties' conduct. We reject this claim for two reasons. First, Bock never agreed, expressly or implicitly, to be responsible for paying for the materials plaintiff delivered to Mastro. Bock only agreed to issue joint checks  the checks represented money Bock owed to Mastro. Second, Bock only agreed to issue the checks up to $125,000. Bock fulfilled that obligation. When plaintiff requested an upward modification, after Bock had already fully performed, Bock declined, and suggested that plaintiff deal directly with Mastro. Simply put, plaintiff is unable to prove that Bock breached the Agreement, or otherwise breached a contract, either express or implied, with plaintiff. Plaintiff's arguments to the contrary on its contract claims are without sufficient merit to warrant additional discussion. R. 2:11-3(e)(1)(E).
Affirmed.